UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

MISTI MYERS,

    Plaintiff,

 v.             CAUSE NO. 1:19-cv-318 DRL

ANDREW M. SAUL,
Commissioner of Social Security,

    Defendant.

OPINION & ORDER

Misti Myers seeks judicial review of the Social Security Administration's decision denying her application for disability insurance benefits under Title II of the Social Security Act. *See* 42 U.S.C. § 423(d). Ms. Myers requests benefits or alternatively remand of her claim for further consideration. Having reviewed the underlying record and the parties' arguments, the court affirms the Commissioner's decision.

BACKGROUND

In April 2016, Ms. Myers filed an application for Social Security disability insurance benefits, alleging a disability onset date of April 1, 2010 [R. 15, 217-18]. Her application was denied initially and upon reconsideration [R. 15, 125-28, 130-32]. On both October 4, 2017 and February 23, 2018, hearings were held before Administrative Law Judge Arman Rouf [R. 15, 46-92 (transcript of oral hearings), 93-99 (same)].

On June 11, 2018, the ALJ issued a decision finding that Ms. Myers was disabled from March 10, 2015 to June 26, 2017, and that her disability ended on June 26, 2017 when medical improvement occurred [R. 11-45]. Ms. Myers challenged the ALJ's decision by timely filing a request for review of hearing decision with the Appeals Council [R. 1]. The Appeals Council denied review on May 20, 2019

[*Id.*]. Because the Appeals Council denied review of the ALJ's unfavorable decision, that ALJ decision is the final decision of the agency. *See* 20 C.F.R. § 404.981.

Thereafter, Ms. Myers timely filed her complaint with this court. Ms. Myers filed an opening brief. The Social Security Administration timely filed a response, and Ms. Myers replied. The issues are ripe for decision.

STANDARD

The court has authority to review the ALJ's decision under 42 U.S.C. § 405(g); however, review is bound by a strict standard. Because the Council denied review, the court evaluates the ALJ's decision as the Commissioner's final word. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). The ALJ's findings, if supported by substantial evidence, are conclusive and nonreviewable. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is such evidence that "a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971), and may well be less than a preponderance of the evidence, *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Richardson*, 402 U.S. at 401). If the ALJ has relied on reasonable evidence and built an "accurate and logical bridge between the evidence and her conclusion," the decision must stand. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Even if "reasonable minds could differ" concerning the ALJ's decision, the court must affirm if the decision has adequate support. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

DISCUSSION

When considering a claimant's eligibility for disability benefits, an ALJ must apply the standard five-step analysis: (1) is the claimant currently employed; (2) is the claimant's impairment or combination of impairments severe; (3) do her impairments meet or exceed any of the specific impairments listed that the Secretary acknowledges to be so severe as to be conclusively disabling; (4) if the impairment has not been listed by the Secretary as conclusively disabling, given the claimant's

residual functional capacity, is the claimant unable to perform her former occupation; (5) is the claimant unable to perform any other work in the national economy given her age, education, and work experience. 20 C.F.R. § 404.1520; *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof until step five, where the burden shifts to the Commissioner to prove that the claimant can perform other work in the economy. *See id.*

The ALJ employed the five-step process and found that Ms. Myers was not disabled under the Act before March 10, 2015. She became disabled on that date and continued to be disabled until June 26, 2017, when medical improvement occurred [R. 15, 36]. The ALJ found that Ms. Myers satisfied step one by not engaging in substantial gainful activity since the alleged onset date—April 1, 2010 [R. 18]. The ALJ then found that Ms. Myers satisfied step two because she had several severe impairments, including headaches, fibromyalgia, systematic lupus erythematosus, bilateral carpal tunnel syndrome, status post bilateral carpal tunnel release, bilateral cubital tunnel syndrome, generalized anxiety disorder, major depressive disorder, panic disorder, obsessive-compulsive disorder, post-traumatic stress disorder, and compulsive personality disorder [R. 18]. Next, the ALJ found that Ms. Myers' impairments did not meet or exceed any of the specific impairments listed that are so severe as to be conclusively disabling [R. 18-20].

The ALJ then found that, before March 10, 2015, Ms. Myers had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b), except she could not constantly handle, finger, or feel bilaterally, but could do so on a frequent basis [R. 20]. She could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she could never climb ladders, ropes, or scaffolds; she had to avoid unprotected heights, moving mechanical parts, and operating a motor vehicle [*Id.*]. She could tolerate moderate noise, lighting found in a typical office environment, and occasional exposure to dust, odors, fumes, and other pulmonary irritants. [*Id.*]. The ALJ further found that Ms. Myers retained the mental RFC to perform simple, routine, and repetitive

tasks; maintain attention and concentration for two-hours segments; make simple work-related decisions; tolerate occasional changes in a routine work setting; and occasionally interact with the public. [*Id.*].

At step four, the ALJ determined, based on his RFC findings, that Ms. Myers was unable to continue performance of her past relevant work [R. 34]. At step five, however, the ALJ found that, considering Ms. Myers' age, education, work experience, and RFC, there were jobs that exist in the national economy that she could perform [R. 34-35]. Specifically, the ALJ found Ms. Myers capable of performing the duties of an electrical accessories assembler (DOT 729.687-010); office helper (DOT 239.567-010); and market-retail (DOT 209.587-034). *Id.* Because of his determination at step five, the ALJ found that Ms. Myers was not disabled under the Act before March 10, 2015 [R. 35].

Beginning March 10, 2015 through June 26, 2017, the ALJ found that Ms. Myers had the physical RFC to perform light work, except she could not constantly handle, finger, or feel bilaterally, but could do so on a frequent basis; she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she could never climb ladders, ropes, or scaffolds; she had to avoid unprotected heights, moving mechanical parts, and operating a motor vehicle; and, she could tolerate moderate noise, lighting found in a typical office environment, and occasional exposure to dust, odors, fumes, and other pulmonary irritants [R. 35]. The ALJ further found that Ms. Myers retained the mental RFC capacity to perform simple, routine, and repetitive tasks; maintain attention and concentration for two-hour segments; make simple work-related decision; tolerate occasional changes in a routine work setting; she could occasionally interact with the public; and, in addition to the normal work breaks, Ms. Myers could be off task 20% of the time in an eight-hour workday [*Id.*]. The ALJ found that Ms. Myers' migraine headaches during this period were so distracting that they would have prevented her from remaining on task for at least 85% of the workday, in addition to normal work

4

breaks [*Id.*]. Accordingly, the ALJ found that Ms. Myers was disabled from March 10, 2015 through June 26, 2017 [*Id.*].

The ALJ then found that medical improvement occurred on June 26, 2017 [R. 36]. *See* 20 C.F.R. § 404.1594(b)(1). Ms. Myers' medical improvement related to her ability to work because, by June 26, 2017, she no longer needed breaks beyond normal work breaks and she could stay on task throughout an eight-hour workday [R. 37]. Accordingly, the ALJ found that Ms. Myers' disability ended on June 26, 2017.

Ms. Myers argues that the ALJ made four mistakes that necessitate either benefits or remand: (1) the ALJ did not have substantial evidence to conclude that medical improvement occurred on June 26, 2017; (2) the ALJ erred in giving Dr. Ringwald's opinion little weight; (3) the ALJ lacked substantial evidence in analyzing Ms. Myers' psychological impairments; and (4) the ALJ erred in his analysis of Ms. Myers' desire to have children in contravention of public policy [ECF 11 at 19].

    A.    *Substantial Evidence Supports the ALJ's Conclusion that Medical Improvement Occurred on June 26, 2017.*

The parties agree that Ms. Myers was disabled from March 20, 2015 through June 26, 2017. The parties dispute the ALJ's conclusion that medical improvement occurred on June 26, 2017 such that she was no longer disabled. This first issue concerns whether the ALJ had substantial evidence for his conclusion. *See Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

Medical improvement is "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A finding of decreased medical severity must be based on "changes (improvement) in the symptoms, signs or laboratory findings associated with [the claimant's] impairment(s)." *Id.*; *see Blevins v. Astrue*, 451 F. Appx. 583, 585 (7th Cir. 2011). When an ALJ finds the claimant disabled for a closed period in the same decision in which she finds medical improvement, the ALJ compares the severity of the claimant's current medical condition

5

to the severity of the condition as of the disability onset date. 20 C.F.R. §§ 404.1594(b)(7) & 416.994(b)(1)(vii); *see also Koslow v. Astrue*, 2009 U.S. Dist. LEXIS 43811 at 30 (N.D. Ind. May 22, 2009) (Cherry, J.). The burden of proof in showing medical improvement lies with the Commissioner. *See* 20 C.F.R. § 404.1594(b)(5) ("In most instances, we must show that you are able to engage in substantial gainful activity before your benefits are stopped."); *see also Stewart v. Astrue*, 2012 U.S. Dist. LEXIS 100998 at 5 (N.D. Ill. July 19, 2012). The ALJ's findings must be supported by substantial evidence. *Henderson*, 179 F.3d at 512. This court may not reweigh the evidence to resolve a question of fact, which is reserved for the Commissioner. *See Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000).

The court is satisfied that the ALJ presented substantial evidence of medical improvement in his decision. On June 26, 2017, Ms. Myers' neurologist, Dr. Haller, assessed that her chronic migraines were under control and that overall she was doing better [R. 36, 1290-1332]. Ms. Myers also told Dr. Haller that her lupus was under "excellent" control, which the ALJ noted was consistent with what Ms. Myers told her rheumatologist, Dr. Ringwald, on June 12, 2017 [*Id.*]. Ms. Myers said that she was doing well, denied any flares, had zero out of 10 pain, and had four out of 10 fatigue. [*Id.*]. On examination, Ms. Myers had no active synovitis, zero out of 18 trigger points, and looked very well; and Dr. Ringwald noted that, though Ms. Myers had fibromyalgia, her condition was much better [*Id.*].

A July 14, 2017 record from Dr. Haller noted diagnoses of muscle spasms and pain and plans to treat Ms. Myers with trigger point injections, but when Ms. Myers saw Dr. Corbin on November 9, 2017, she reported she was not having any problems, and her physical examination was essentially normal [R. 36, 1333-36, 1442-59]. When Ms. Myers saw Dr. Ringwald on December 18, 2017, she said that she was feeling well, felt tremendously improved, and felt great on Cymbalta other than some occasional hot flashes [R. 36, 1506-21]. Ms. Myers also reported that the medications her neurologist had her on kept her headaches under control [*Id.*]. At her January 24, 2018 appointment with Dr. Haller, she reported having one to two headaches a week, which were less severe, and which she could

6

manage with exercises, ice, heat, and plenty of drinking water [R. 36, 1522-63]. She reported that she could tell when she was going to have a migraine and used Sumatriptan/Imitrex early, which was typically effective for her headaches [*Id.*]. Although Dr. Haller indicated that Ms. Myers complained of having a lot of tension, she appeared more comfortable than at previous visits [R. 36-37, 1522-63]. Ms. Myers stated that Botox therapy helped her manage her migraines [R. 37, 1522-63]. Dr. Haller assessed that Ms. Myers was doing better regarding her migraines [*Id.*]. At this appointment, Ms. Myers also reported that she had very severe temporal pain a few times a week, but that the pain was unlike pain caused by her migraines in that the pain peaked in intensity very quickly and did not last long [*Id.*]. Dr. Haller started new treatment with Verapamil and subcutaneous Sumatriptan for suspected cluster headaches, which he believed these episodes were, and noted that these episodes were shorter in duration than Ms. Myers' migraine headaches [*Id.*].

To refute the ALJ's conclusion, Ms. Myers points to evidence that may indicate that improvement did not occur. Dr. Haller's June 26, 2017 note indicated that Ms. Myers had been having headaches "less frequently," but that they had recently increased because of stress [R. 1319]. Ms. Myers reported using sumatriptan, her migraine abortive medication, twice that week [*Id.*]. At this visit, Dr. Haller increased her dose of zonisamide and added naproxen to take with sumatriptan for improved efficacy of migraine control [R. 1321]. Ms. Myers argues that the change in medication and discussion of other methods to treat her migraines, headaches, and neck pain is evidence that medical improvement did not occur on this date.

Ms. Myers also claims that the ALJ inaccurately pointed to an inconsistency in the record when the ALJ found that it was odd that although she reported muscle spasm and pain to Dr. Haller on July 14, 2017, she did not report any problems to Dr. Corbin in November 2017 [R. 36, 1334-35, 1445]. The court agrees with the Commissioner that the ALJ was not claiming this to be an inconsistency, but was merely using these statements to summarize Ms. Myers' treatment record. That Ms. Myers

7

was not complaining of muscle spasms and pain in November 2017 supported the ALJ's determination that her impairments medically improved [R. 36, 1333-36, 1442-59]. The ALJ also noted that the objective medical evidence showed that Ms. Myers' November 9, 2017 physical examination was essentially normal [R. 36, 1333-36]. Ms. Myers also told Dr. Ringwald in December 2017 that she had been feeling well and felt "tremendously improved" [R. 36, 1506-21].

Ms. Myers is effectively asking the court to reweigh the evidence and resolve conflicts of fact, which it may not do. *See Powers*, 207 F.3d at 434-35. Substantial evidence existed. The court is satisfied that the ALJ built a "logical bridge" between the evidence and his conclusion that medical improvement occurred. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).

      B.     *Substantial Evidence Supports the ALJ's Conclusion to Give Dr. Ringwald's Opinion Little Weight.*

Ms. Myers next contends that the ALJ erred in giving Dr. Ringwald's opinion little weight. A treating physician's opinion is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (quotation omitted). An ALJ must offer "good reasons" for discounting a treating physician's opinion. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). When the ALJ does not give a treating physician's opinion controlling weight, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). An ALJ does not need to "explicitly weigh each factor" so long as the ALJ's decision makes clear that those factors were considered. *Schreiber v. Colvin*, 519 F. Appx. 951, 959 (7th Cir. 2013). In deciding the weight to give certain types of evidence, an ALJ "must be careful not to succumb to the temptation to play doctor." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). That said, the court does "not reweigh the evidence, resolve conflicts, decide questions of credibility, or

8

substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Regarding the *Moss* factors, the ALJ discussed the dates on which Ms. Myers' examinations occurred with Dr. Ringwald and the nature of those examinations. The ALJ noted that Dr. Ringwald was a rheumatologist and talked about the types of tests she performed. The ALJ also discussed the consistency and supportability of the physician's opinion [R. 26-27].

In particular, the ALJ found that Dr. Ringwald's opinion deserved less weight because she seemed to qualify her opinion and because her opinion was inconsistent with her treatment records and Ms. Myers' reports about her conditions [*Id.*]. While Dr. Ringwald opined that Ms. Myers likely did not have the stamina and endurance to work eight hours a day, five days a week, she also stated, "I'm truly guessing but would suggest a functional capacity evaluation if more objective data was needed" [R. 26, *see* R. 1412]. The ALJ noted that Dr. Ringwald also opined that Ms. Myers would be off task twenty percent of the time, but then said, "I would again want a functional capacity evaluation for more objective evidence" [R. 26, *see* R. 1413].

The qualifying language within Dr. Ringwald's opinion permitted the ALJ to give less weight to that opinion. The ALJ had no duty here to solicit additional information about Dr. Ringwald's opinion. "An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). In this case, the ALJ concluded (and was right) that the medical evidence was sufficient for him to properly weigh Dr. Ringwald's opinion.

The ALJ also concluded that Dr. Ringwald's opinion was unsupported by and inconsistent with her treatment records and Ms. Myers' reports about her conditions [R. 26-27]. The ALJ pointed to various examples of inconsistencies, such as an April 29, 2010 treatment record from Dr. Ringwald that indicated that Ms. Myers did not have any physical problems that would prevent her from working

[R. 22, 651-53]. The ALJ noted that a February 24, 2011 treatment record from Dr. Ringwald stated that Ms. Myers' lupus anticoagulant, which had been positive, was now negative [R. 22-23, 598-600]. The ALJ also noted that on March 4, 2013, Ms. Myers was approximately fifteen weeks pregnant, that she was doing well off drugs (Plaquenil) with respect to her lupus, and had no active synovitis [R. 24, 388-89]. The ALJ's discussion of the *Moss* factors affords meaningful review. *Moss*, 555 F.3d at 561. Ms. Myers effectively asks the court to reweigh the evidence, which this court cannot do. *Clifford*, 227 F.3d at 869.

      C.    *The ALJ's Analysis of Ms. Myers' Psychological Impairments Was Supported by Substantial Evidence.*

Ms. Myers next contests the ALJ's decision to give little or "some" weight to the opinions of Dr. Williams and Dr. Rustagi [*see* R. 29, 33]. Dr. Williams addressed Ms. Myers' compulsive behaviors, fears, suicidal thoughts, and self-harm [R. 1377-79]. Dr. Williams noted diagnoses of post-traumatic stress disorder, severe obsessive-compulsive disorder, and major depression, and elaborated that Ms. Myers had intense irrational fears of her environment being "unsafe"; she spent her days cleaning, organizing, and disinfecting her home; and she was extremely fearful of letting her daughters out of her sight [R. 29, 877-78]. Dr. Williams opined that these traits incapacitated Ms. Myers to the point of barely functioning [*Id*.]. Dr. Williams opined that if Ms. Myers received disability for a period, it would relieve her of some of the pressure so she could concentrate on getting well [*Id*.].

The ALJ addressed the *Moss* factors in her opinion, though, noting especially that Dr. Williams had treated Ms. Myers for less than six months and had indicated that Ms. Myers was responding well to therapy [R. 29, 31]. Dr. Williams also observed that Ms. Myers was improving in December 2016 [R. 29]. The ALJ also noted that Ms. Myers reported that on December 19, 2016, it had been a good year for her; that she was ready to make changes; and that she was finally on the right medicine [R. 29, 1460-96]. Dr. Williams noted that Ms. Myers appeared calm, cheerful, and optimistic; she also noted

that Ms. Myers was "light years" away from where she started and had come to terms with her childhood abuse, death of her son, and abuse from her parents [R. 29-30, 1460-96].

The ALJ also noted that on December 12, 2016, Ms. Myers told another doctor, Dr. Rustagi, that Lexapro had been very helpful, that she was mostly happy with the medication, and that she had completely tapered off Xanax [R. 30, 1383-1408]. She said that she found psychotherapy helpful [*Id.*]. The ALJ noted that Ms. Myers' mental status exam was within normal limits, with euthymic mood and normal ranges of expressions [*Id.*]. Dr. Williams indicated that Ms. Myers had "limited but satisfactory" abilities to sustain an ordinary routine, accept instructions from supervisors, and get along with coworkers [R. 30, 1377-79].

Ms. Myers points to evidence that might warrant more weight for Dr. Williams' opinion. He saw Ms. Myers eleven times [R. 877], and he indicated that Ms. Myers still had "work to do" though she was improving [R. 1477]. The ALJ acknowledged Ms. Myers' symptoms and said that Dr. Williams' report indicated that Ms. Myers had no structured days and that her obsessive-compulsive disorder was going wild [R. 31]. But then the ALJ noted that at Ms. Myers' June 28, 2017 follow-up visit with Dr. Williams, she was doing better, and that she reported that things were going well in September 2017 while she was on Lexapro and Buspar [*Id.*]. This evidence in total may create a need to resolve seeming conflicts, but the ALJ did that and offered substantial evidence to reach his conclusion. The court may not reweigh the evidence under these circumstances. *Clifford*, 227 F.3d at 869.

With respect to Dr. Rustagi, the ALJ noted that Dr. Rustagi found Ms. Myers' emotions to be well modulated, that her insight and judgment indicated good introspection into and understanding of her psychiatric status, that her thought content was relevant and reality based, that her abstract reasoning and conceptualization was good, and that she was able to pay attention and focus [R. 32, 1383-1408]. She reported to Dr. Rustagi that her medications were helpful in that she was able to let things go, and her mental status exam was essentially within normal limits in both August and October

2017 [*Id.*]. While Ms. Myers' mood appeared anxious on the mental status exam in December 2017, the ALJ noted that Buspar controlled the anxiety level and continued to work well for her [*Id.*]. Ms. Myers' anxiety had improved by January 4, 2018 [R. 32-33, 1497-98].

The ALJ considered Dr. Williams' and Dr. Rustagi's treatment relationships with Ms. Myers and considered their expertise in psychology and psychiatry [R. 31]. The ALJ concluded, however, that their opinions were not supported by or consistent with their own treatment records, which reduced the weight the ALJ gave to those opinions [*Id.*]. The court is satisfied that the ALJ properly weighed the *Moss* factors for Dr. Williams and Dr. Rustagi. *See Moss*, 555 F.3d at 561. There is a logical bridge between the evidence and the ALJ's conclusion supported by substantial evidence. *O'Connor-Spinner*, 627 F.3d at 618; *see also Clifford*, 227 F.3d at 871 ("internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion" so long as the ALJ adequately articulates his reasoning for discounting the treating physician's opinion).

> D. *The ALJ Had Substantial Evidence for His Analysis of Ms. Myers' Symptoms, and His Analysis was Proper.*

The ALJ's opinion referred to Ms. Myers' pregnancy and breastfeeding when evaluating whether Ms. Myers was disabled [*see* R. 23-25]. It also noted that Ms. Myers sought to avoid certain medications because of her goals related to pregnancy [*Id.*]. Ms. Myers contends that these considerations are not part of the regulatory factors to be discussed when analyzing an individual's subjective complaints and should not have been used in analyzing the credibility of her pain. She says this was against public policy.

"An ALJ is in the best position to determine a witness's truthfulness and forthrightness; thus, this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004) (quoting *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). The factors to consider in evaluating a claimant's symptoms are laid out in 20 C.F.R. § 404.1529(c), which includes a plaintiff's daily activities, testimony, and both objective and subjective

evidence of record in assessing the evidence. "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating" the claimant's credibility, "this must be done with care" because an "ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *see also Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005) ("taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not").

The ALJ considered Ms. Myers' statements to medical providers, her testimony, her activities of daily living "with care," *see Roddy*, 705 F.3d at 639, and the medical evidence of record in accordance with 20 C.F.R. § 404.1529(c). The ALJ referred to a wide variety of other factors in coming to his conclusion, which complies with the requirements of 20 C.F.R. § 404.1529(c). While the ALJ did refer to Ms. Myers' ability to breastfeed and her pregnancy, he did so within the context of recounting her medical history [R. 23-25].

Regarding daily activities, the ALJ noted that when Ms. Myers had a headache, she said she did just enough to get by [R. 20]. For activities when she did not have a headache, Ms. Myers testified that she did a load of laundry, household chores, and washed a load of dishes [*Id.*]. Ms. Myers indicated that the schooling program her daughter used was relaxed enough to accommodate her headaches [*Id.*]. The ALJ noted that Ms. Myers reported that she fixed dinner, cooked regular meals three times a week, fed and watered her Yorkshire terrier, and shopped [R. 21]. The ALJ also noted that Ms. Myers had social contacts—she visited her mother twice a week and communicated by smart phone, internet, and Facebook [*Id.*]. She left her house three times a week to take her daughter to her grandparents and to lessons, as well as to go to the grocery store [*Id.*]. Additionally, the ALJ discussed the objective medical evidence that did not support Ms. Myers' allegations of disability. *See supra* Section B.

Both parties cite to *Toliver v. Berryhill*, 2018 U.S. Dist. LEXIS 205718 (N.D. Ill. Dec. 6, 2018)— in either an attempt to support argument or to distinguish this case from *Toliver*. *Toliver* held that a

claimant's "ability to give birth and to raise children does not shed any light on how she would have faced 'the challenges of daily employment in a competitive environment.'" *Toliver*, 2018 U.S. Dist. LEXIS 205718 at 17 (quoting *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014)). Mere mention of childbirth or raising children is not improper, but the ALJ should indeed exercise "caution in equating these activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member." *Beardsley*, 758 F.3d at 838. Daily activities shed light on a claimant's disability so long as the ALJ analyzes them "with care." *Roddy*, 705 F.3d at 639.

The ALJ in *Toliver* had bigger issues than the ALJ here. The ALJ there failed to account for how severely limited the plaintiff was in her ability to perform the activities of child raising and household duties, such as the plaintiff's need for help from family and friends in taking care of her children. *See Toliver*, 2018 U.S. Dist. LEXIS 205718 at 18. The ALJ had not analyzed these activities "with care." *Id.* at 17. By contrast, Ms. Myers points to no evidence in the record that shows that the ALJ failed to analyze her activities "with care." The ALJ here "sufficiently articulate[d] his assessment of the evidence to assure [the court] that the ALJ considered the important evidence." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quotation omitted). The ALJ properly evaluated Ms. Myers' symptoms.

## CONCLUSION

The court finds that the ALJ adduced substantial evidence for each of his conclusions and built a logical bridge from the evidence to those conclusions. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Accordingly, the court AFFIRMS the decision and DENIES Ms. Myers' request for benefits or remand (ECF 11).

SO ORDERED.

March 30, 2020                    *s/ Damon R. Leichty*
                                  Judge, United States District Court